UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

CHRISTOPHER LLEWELLYN,

                              Petitioner,

          - versus -

PEOPLE OF THE STATE OF NEW YORK,

                              Respondent.

**MEMORANDUM
AND ORDER**
14-CV-2446 (JG)

**A P P E A R A N C E S**

CHRISTOPHER LLEWELLYN
        09A5486
        Great Meadow Correctional Facility
        11739 State Route 22
        P.O. Box 51
        Comstock, New York 12821
        *Petitioner Pro Se*

KENNETH P. THOMPSON
        Kings County District Attorney's Office
        350 Jay Street
        Brooklyn, New York 11201
By:     Leonard Joblove
        Keith Dolan
        *Attorneys for Respondent*

JOHN GLEESON, United States District Judge:

          Christopher Llewellyn brings this *pro se* habeas petition, seeking relief from a

state court judgment convicting him of Assault in the First Degree.  Llewellyn claims that he was

deprived of his Sixth Amendment rights to confrontation and effective assistance of counsel at

trial, as well as his Fifth Amendment right to due process.  Oral argument was held on November

14, 2014, at which Llewellyn appeared by videoconference from the facility in which he is

serving his sentence. For the reasons set forth below, the petition is stayed, and will be held in abeyance pending the exhaustion of Llewellyn's non-exhausted claims in state court.

BACKGROUND

In May 2008, Llewellyn was tried before a jury in the Supreme Court of the State of New York, Kings County, on one count of Attempted Murder in the Second Degree, N.Y. Penal Law §§ 110.00 & 125.25(1), one count of Assault in the First Degree, N.Y. Penal Law § 120.10(1), and various lesser counts. Affidavit of Keith Dolan ¶ 5, ECF No. 6.[1]

A.    *The Government's Case*

At trial, the Government presented evidence that Nicholas Crooks, the victim, met Llewellyn sometime in 2007 because Crooks was in a relationship with Llewellyn's sister, Arlene. Tr. 75, 81-82, 205-07, 220.[2] A few weeks after meeting Crooks, Llewellyn accused him of stealing a ring from his apartment. Crooks denied stealing the ring at that time. Tr. 82-83. In the months preceding the shooting, Crooks saw Llewellyn approximately six or seven times, and on those occasions, Llewellyn again accused Crooks of stealing the ring. Tr. 165-66, 209, 212, 218-19, 224.

On May 27, 2008, at around 7:00 p.m., Crooks left his grandmother's house in the Brownsville section of Brooklyn and walked toward the subway on Livonia Avenue to return home. Tr. 96-100. When Crooks walked by "The Castle," an apartment building on Kings Highway, he saw Llewellyn standing outside. Tr. 74, 101-02, 184.

---

[1]    In response to the Order to Show Cause, the People of the State of New York provided an affidavit and memorandum of law, as well as: (i) a transcript of Llewellyn's trial and sentencing before the New York Supreme Court, Kings County; (ii) Llewellyn's brief, by appellate counsel, to the New York Supreme Court, Appellate Division, Second Department; and (iii) the government's brief to the New York Supreme Court, Appellate Division, Second Department, in opposition to Llewellyn's brief.

[2]    I will use "Tr." to denote the trial transcript and "S. Tr." to denote the sentencing transcript. Transcripts are filed as exhibits to the Response to Order to Show Cause, ECF Nos. 6 & 7.

According to Crooks, other people were also outside the building, but Llewellyn, who lived there, was standing alone.  Tr. 101-02, 163-64.  Llewellyn made eye contact with Crooks but did not say anything.  Tr. 102.  Crooks continued walking, but Llewellyn approached Crooks a few blocks away, placed his hand on Crooks, and asked for his ring.  Tr. 103-04.  Crooks stood face-to-face with Llewellyn, brushed Llewellyn's hand away, and told him that he did not have his ring.  Tr. 104-06.

As Crooks began to walk away, Llewellyn stated that he had a gun.  Tr. 104-09.  Crooks turned around and saw Llewellyn pull a dark object that looked like a gun from his waistband.  Tr. 107-09, 178-79, 217-18, 223-24.  Crooks then started to run.  Shortly after that, he heard three gunshots and felt his back burning.  Tr. 108-10.  He had difficulty breathing and fell by a garage near a group of people.  Tr. 111-12.  According to Crooks, Llewellyn had been alone at the time of the shooting.  Tr. 103-04, 107, 172-75.  Though Crooks had observed people down the street when Llewellyn drew his gun, they were not near him.  Tr. 163-64, 172-77.

Another government witness, Patrick Joyner, testified that at approximately 8:20 p.m., he was having a cookout at his garage at 296 Livonia Avenue when he heard gunshots.  Tr. 682-84.  Joyner then saw the injured Crooks stumbling toward the garage.  Tr. 685.  Joyner also saw four or five men and women fleeing the area.  Tr. 689-91.  Crooks fell in the garage doorway and asked for his mother.  Tr. 686.  After Crooks collapsed, he thought he was going to die and repeatedly told the people at the garage that "Arlene's brother shot me."[3]  Tr. 112-13; 685-87.  Joyner did not see Crooks with a gun or see him throw anything away.  Tr. 685.

After one of Joyner's guests called 911, Police Officer Matthew Geramita and EMT Henry Snead arrived at the scene.  Tr. 51-54; 229-31, 688-89.  Snead testified that Crooks

---

[3]     Joyner testified that Crooks "thought he was gonna die.  He kept saying what's her name shot me, who shot me, who shot me --  he said Carlene, Darleen brother shot me, something like that."  Tr. 686.

had been shot multiple times, was going into shock, and looked as if he was going to die prior to reaching the hospital. Tr. 55-57, 63. Detective John Ulmer rode in the ambulance with Crooks to Brookdale Hospital. Tr. 59, 234, 727-29. While in the ambulance, Crooks kept repeating that "Arlene's brother" had shot him. Tr. 59-60, 122-23, 730. When Detective Ulmer asked Crooks who Arlene was, Crooks responded that he "used to go with her and she lived at the Castle." Tr. 733.

Doctor Rajasekhar Malyala treated Crooks at Brookdale Hospital. Tr. 486-88. Crooks had three gunshot wounds: two to his back and one to his right arm. Tr. 489. Two bullets were removed, but for medical reasons, one bullet was left in place and remained lodged in Crooks' back. Tr. 505-06. Crooks sustained significant internal bleeding and required multiple surgeries, during which a portion of his lung was removed. Tr. 492-93, 499. Crooks remained on a ventilator, in a comatose state, in the intensive care unit for over a month during his two-month hospitalization. Tr. 148-49, 500-04.

On July 8, 2008, Detective Darrel Chavers arrested Llewellyn at the 73rd Precinct. Tr. 544, 598. The detective told Llewellyn that he wanted to speak to him about an incident on May 27, 2008 and read Llewellyn his *Miranda* rights. Tr. 551-52, 734-35. Llewellyn understood and waived his rights, and he signed a *Miranda* waiver. Tr. 553-55.

Llewellyn initially told Detective Chavers that he did not have anything to do with the shooting. Tr. 556, 597, 604. Detective Chavers remarked to Llewellyn that he thought he was lying because the shooting had been captured on a surveillance video, and Llewellyn was depicted on the video running away. Tr. 559, 605, 651. In fact, as Detective Chavers knew, the surveillance from the nearby medical center did not depict the actual shooting. Tr. 529, 134-35, 605-06. It did show, however, Crooks walking on the street toward the train station, Llewellyn

4

wearing a hoodie and walking away from The Castle in Crooks' direction, and Llewellyn, a short time later, running back towards The Castle. Tr. 128-36. At trial, Crooks identified these parts of the video for the jury and also identified Llewellyn as the shooter. Tr. 74, 128-36.

At the precinct, after having been informed that the shooting was caught on tape, Llewellyn told Detective Chavers that on May 27, he saw Crooks in front of his building and exchanged words with him. Tr. 560-61, 737. Llewellyn stated that he knew Crooks through his sister, Arlene, and had confronted Crooks on previous occasions about a ring that Llewellyn believed Crooks had stolen. *Id.* Llewellyn told the detective that Crooks appeared to have something in his waistband so Llewellyn went inside his apartment and retrieved a gun. *Id.* Llewellyn stated that he followed Crooks down Livonia Avenue and confronted Crooks about the ring. *Id.* Llewellyn claimed that Crooks looked like he was going for his waist so Llewellyn pulled out his gun and started firing. *Id.* He did not know whether he had hit Mr. Crooks at the time. Tr. 737. Llewellyn then ran back to The Castle where he lived. Tr. 560-61, 737.

Llewellyn further stated that he had used a .38 caliber firearm, and that someone had recently been arrested in the 75th Precinct with that gun. Tr. 631-34, 738-39. However, Llewellyn did not tell Detective Chavers that a person named Jay had done the shooting or that Jay was the person arrested with the gun in the 75th Precinct. Tr. 631-33.

Llewellyn also made a written statement, which was more detailed but similar in substance to his oral statement. Tr. 562-66. Llewellyn's written statement did not mention that the gun was recovered in the 75th Precinct. Tr. 634-35. Llewellyn wrote that, upon retrieving his gun, a .38 caliber revolver, he caught up to Crooks and asked for "closure" about the ring. Tr. 566. Crooks "fidgeted," "like he was about to do something," and Llewellyn shot at him, but missed. *Id.* Crooks ran toward a garage, and Llewellyn assumed that he had dropped off what

he had on him. *Id.* Llewellyn cut his hair because he did not "hit Mr. Crooks critically." *Id.* After the incident, "Crips" gang members started leaving phone messages at Llewellyn's apartment. *Id.*

Llewellyn gave a videotaped statement that essentially repeated his oral and written statements. Tr. 567-71; Defendant's Brief to the New York Supreme Court, Appellate Division, Second Department[4] ("Def. Br.") at 13. He said that he had been "holding" the .38 revolver for someone named "Jay." Def. Br. at 13. Before shooting at Crooks, Llewellyn saw the "silver" of Crooks's weapon. *Id.* Since Crooks ran to an auto garage, Llewellyn did not believe he had shot him. *Id.*

At no time did Detective Chavers threaten Llewellyn, make any promises to him, (Tr. 562, 568, 736-38), or tell him that he should claim self-defense. Tr. 656-57, 676. After speaking with Llewellyn, the detective made a computer search of arrests in the 75th Precinct involving .38 caliber handguns and discovered that a .38 caliber handgun had been seized during the unrelated arrest of Robert Graham. Tr. 633-34, 675-76, 679. Detective John Muzek determined that the two bullets removed from Crooks had been fired from the .38 caliber gun recovered in the Graham arrest. Tr. 319-22, 330-47, 598-600.

Between July 10, 2008 and January 2009, Llewellyn made twenty-one telephone calls from Rikers Island to a cell phone belonging to Karen Bartley-Bailey, a close friend of Robert Graham, also known as Jay. Tr. 461-62, 474-76, 478, 718-21. Bartley-Bailey gave Graham the cell phone in February 2008, and when she would call him at that number, he would answer. Tr. 463-64. Bartley-Bailey paid Graham's bail. Tr. 476. On August 22, 2008, Bartley-Bailey took the phone back from Graham because he did not reimburse her for his bail. Tr. 463-64, 478.

---

[4]      Response to Order to Show Cause, Exhibit 1, ECF No. 6.

B.    *The Defense Case*

In defense, Llewellyn presented evidence that on May 27, 2008, at approximately

8:20 p.m., Noel Burgin was standing on the stoop of 257 Grafton Street.  He saw three men

talking about 100 feet away, near the corner of Livonia Avenue.  Tr. 801-02, 812.  According to

Burgin, one of the men was on a bicycle.  Tr. 804.  Approximately fifteen minutes later, Burgin

heard gunshots.  Tr. 812.  Burgin testified that he was not looking up when the shooting started.

Tr. 804-05.  Burgin testified on direct that he did not remember which man did the shooting, and

on cross that he did not see who the shooter was.  Tr. 806, 813.  When he heard the first shot,

Burgin had ducked.  Tr. 813.  After the gunshots, he saw an injured man run past him.  *Id.*

Burgin initially testified that he saw the two other men run in the opposite direction, but later

said that one of men picked up a bicycle from the sidewalk and rode away.  Tr. 802-03, 813-14.

According to Burgin, one of the men wore a white tee-shirt and bandana.  Tr. 803.

Llewellyn also testified on his own behalf.  He lived with his mother and sister,

Arlene, at 9720 Kings Highway.  Tr. 845, 877.  He claimed that he did not own a gun, and that

he had never been convicted of a crime.  Tr. 846.  Llewellyn met Crooks in 2007 when Arlene

had brought Crooks to their house on two occasions.  Tr. 846-49.  Between the time he first met

Crooks and May 27, 2008, Llewellyn saw Crooks approximately ten times.  Tr. 849.  Llewellyn

had accused Crooks of stealing a ring, but later learned that Llewellyn's girlfriend had taken the

ring.  Tr. 847-48, 886.

According to Llewellyn, on May 27, 2008, he was outside his building when

Crooks approached and said "what's cracking" while moving his hands up and down.  Tr. 850-

51.  Llewellyn testified that he believed Crooks' gesture to be a Crip[5] gang sign because,

according to Llewellyn, Crips greet each other with the words "what's cracking," while Bloods

---

[5]    This portion of the transcript refers to the "Crypts" and "Crypt" gang signs.  Tr. 850-52.

greet each other with the words "what's popping." *Id.* Llewellyn testified that he was not a gang member, but Crip members lived in his building. Tr. 851-52.

Llewellyn testified that two men who he knew by the names of Jay and Ryan were outside when Crooks walked by. Tr. 853-54. According to Llewellyn, Jay had a bald head at the time and Ryan had dreads and wore a baseball cap. Tr. 854-55. Llewellyn claimed that Ryan said something to him after Crooks walked by, which prompted him to run after Crooks. Tr. 858, 860-61. When Llewellyn caught up to Crooks, he spoke to him for one or two minutes. Tr. 861-62. On cross-examination, Llewellyn claimed that he spoke to Crooks to warn him about Jay and Ryan. Tr. 887.

Llewellyn testified that seconds after his conversation with Crooks, he heard gunshots and started running toward his building. Tr. 862. Llewellyn claimed that while running, he glanced over his shoulder once and saw Jay and Ryan chasing Crooks. Tr. 863-64. Llewellyn claimed that Ryan had a revolver in his hand and fled the scene on a bicycle. Tr. 863-64, 888-89.

Llewellyn testified that he was wearing a white shirt and jeans, Jay was wearing a white tee-shirt and a bandana, and Ryan was wearing a black "hoodie" and a baseball cap. Tr. 864-65. Llewellyn also claimed that the person in the "hoodie" seen running on the surveillance video was neither Llewellyn nor Ryan. Tr. 865. Llewellyn did not call the police to report the shooting. Tr. 887.

On July 8, Llewellyn went to the police precinct because he was told that he needed to take care of some unpaid fines. When he arrived, he was handcuffed and placed in a cell. Tr. 867-68. Llewellyn later spoke to Detective Chavers, who showed Llewellyn a photograph of Crooks. Tr. 868-69. Llewellyn told the detective that Crooks was a "kid" whom

Llewellyn had accused of stealing a ring.  *Id.*  According to Llewellyn, he told Detective Chavers that Ryan and Jay had committed the shooting, and the detective asked if Llewellyn could bring them into the precinct.  Tr. 869-70.  When Llewellyn told Detective Chavers that he did not know Jay or Ryan well enough to bring them in, the detective told Llewellyn that if he could not arrest Jay or Ryan, then he would "keep" Llewellyn instead.  Tr. 870.  Llewellyn testified that even if he had known Jay and Ryan better, he would not have turned them into the police because they were "dangerous."  *Id.*  Llewellyn acknowledged his written and videotaped statements, but claimed that Detective Chavers had "made" a story for Llewellyn to give and told Llewellyn that if he claimed self-defense, Llewellyn could go home.  Tr. 870-72.  According to Llewellyn, Detective Chavers had told him that the shooting was captured on videotape, and that the police had found a loaded 9mm gun on Crooks.  Tr. 871-72.

Llewellyn acknowledged calling Jay numerous times while he was at Rikers Island.  Tr. 873.  According to Llewellyn, he had called Jay to tell him that Llewellyn had been charged with a crime that Jay had committed, in the hopes that Jay would come forward and take the rap for the shooting.  Tr. 873-74.  Llewellyn said that he called the number so many times because he was desperate, but Jay changed his number eventually.  Tr. 874-75.  Llewellyn testified that on May 27, his hair was half-braided and half-"pulled-out," and that sometime after the shooting, he changed his hairstyle.  Tr. 876.

On rebuttal, the Government elicited from Detective Chavers that Llewellyn made no oral or written statements to him claiming that Jay or Ryan did the shooting.  Furthermore, Detective Chavers did not tell Llewellyn that a gun had been found on Crooks.  Tr. 893-94.

C.    *Sentencing and Direct Appeal*

The trial court submitted to the jury one count of Attempted Murder in the Second Degree and one count of Assault in the First Degree. Tr. 1051. The jury found Llewellyn not guilty of attempted murder but guilty of the assault charge. Tr. 1069. On October 22, 2009, after delivering a 20-minute castigation of defense counsel's conduct at trial, the trial court sentenced Llewellyn to 25 years on the count of first degree assault, plus 5 years of post-supervision release. S. Tr. 1-37.

Llewellyn, represented by new counsel, filed a counseled brief on direct appeal to the Appellate Division of the Supreme Court of New York, Second Department (the "Appellate Division"). The counseled brief, filed on April 27, 2012, argued that: (1) Llewellyn was denied his due process rights to a fair trial, confrontation, to present a defense, and to the effective assistance of counsel by the trial court's pervasive interference in the examination of witnesses and its overt hostility to, and repeated disparagement of, defense counsel; (2) Llewellyn was denied his rights to due process and to present a defense when the court (i) precluded inquiry about an eyewitness's description of the shooting, which cast doubt on the complainant's testimony and supported the defense, and (ii) refused to allow the defense an extra day to locate that witness when the Government unexpectedly decided not to call him to testify; and finally (3) the 25-year sentence imposed on petitioner, a 25-year-old first felony offender, was excessive and should be reduced. Def. Br. at 37-62.

In a Decision and Order dated December 5, 2012, the Appellate Division unanimously modified, and as modified affirmed, Llewellyn's judgment of conviction. *People v. Llewellyn*, 954 N.Y.S.2d 494 (2d Dept. 2012). The Appellate Division rejected on the merits Llewellyn's contentions that he was deprived of his rights to a fair trial, to confrontation, to

present a defense, and to the effective assistance of counsel, because the "trial court's remarks and comments, and the curtailment of defense counsel's questioning, were proper responses to defense counsel's tactics." *Id.* (citations omitted). The Appellate Division also determined that the trial court properly excluded the statements of the alleged eyewitness contained in police reports, as they "lacked sufficient indicia of reliability." *Id.* (citations omitted). In addition, the court concluded that the trial court did not improvidently exercise its discretion in denying the defense request for a one-day continuance to locate a potential eyewitness, "as the record does not indicate that the witness was within the court's jurisdiction or that the requested continuance would have enabled defense counsel to locate the witness." *Id.* (citation omitted). Finally, the Appellate Division, as a matter of discretion in the interest of justice, reduced Llewellyn's sentence from a term of imprisonment of 25 years plus a period of 5 years of post-release supervision, to a term of imprisonment of 18 years plus a period of 5 years of post-release supervision. *Id.*

On March 22, 2013, a judge in the New York Court of Appeals denied Llewellyn's application for leave to appeal. *People v. Llewellyn*, 20 N.Y.3d 1101 (2013) (Read, J.).

D.      *The Instant Petition under 28 U.S.C. § 2254*

Following the decision in his direct appeal, Llewellyn did not submit an application to the Supreme Court to vacate the judgment under New York Criminal Procedure Law § 440. Instead, he filed the instant *pro se* petition for a writ of habeas corpus in this court on April 24, 2014. In his petition, he presents four claims of relief: (1) the trial court's overt hostility to defense counsel made it impossible for him to mount an effective case, thereby violating the Llewellyn's rights to due process, confrontation, and effective assistance of

counsel; (2) he was denied his rights to due process and to present a defense when the trial court precluded inquiry about an eyewitness's description of the shooting that would have been favorable to the defense and refused to allow the defense an extra day to locate that witness when the prosecutor unexpectedly decided not to call him to testify; (3) his sentence of 18 years with 5 years of post-supervision release was excessive and constituted cruel and unusual punishment; and (4) trial counsel was ineffective because he failed to inquire, or otherwise inform the court that one of the jurors knew Llewellyn from junior high school and had a negative opinion of him. Petition for Writ of Habeas Corpus, ECF No. 1 ("Pet.").

Unlike the first three claims, the claim about a possibly biased juror was not the subject of direct appeal at the state level. Llewellyn raised this for the first time at his sentencing hearing on October 22, 2009.[6] At that time, the defense counsel noted that he could not "ethically" bring forward the motion because the defendant was accusing him of ineffective assistance. S. Tr. 17. Defense counsel explained Llewellyn's allegation as follows:

> There was some point during the trial my client says during jury selection I think it was at a later point he said that one of the jurors was familiar to him and at some point he says he realized that he thinks this person was someone he went to school with. He is alleging juror misconduct in that he is saying this person should have revealed that he knows my client.
>
> I don't know whether my client is correct about knowing this person. I don't know whether this person knew my client or not. He is alleging that I was ineffectively assisting him in that I failed to bring forth that alleged fact. This is essentially what I believe the motion comes down to.

S. Tr. 17-18. The trial court denied defense counsel's application to submit the motion on Llewellyn's behalf, stating, "I'm not accepting the pro se motion." S. Tr. 18.

---

[6] Petitioner asserts that as a "layman" he believed that all he had to do was to raise the issue in his motion at sentencing. *See* Pet. at 10.

At the November 14, 2014 oral argument, Llewellyn raised an additional claim, not included in either his petition or his appeal to the Appellate Division; he contended that his defense counsel had actually represented Crooks on an occasion prior to trial, which amounted to a conflict of interest and a separate basis for his ineffective assistance claim.

DISCUSSION

A.    *Legal Standards for Habeas Relief*

Under the Antiterrorism and Effective Death Penalty Act of 1996, federal habeas relief is available when a "person in custody pursuant to the judgment of a State court . . . is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). A federal court may grant habeas relief "with respect to a[] claim that was adjudicated on the merits in State court proceedings" only if the state decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

28 U.S.C. § 2254(b) prevents a federal court from granting a petition for a writ of habeas corpus unless the petitioner has first exhausted all available state judicial remedies. The Supreme Court has commented on the exhaustion requirement as follows in relation to ineffective-assistance claims:

> The principle of comity that underlies the exhaustion doctrine would be ill served by a rule that allowed a federal district court to upset a state court conviction without an opportunity to the state courts to correct a constitutional violation, and that holds true whether an ineffective assistance claim is asserted as cause for a procedural default or denominated as an independent ground for habeas relief.

*Murray v. Carrier*, 477 U.S. 478, 489 (1986) (citation and internal quotation marks omitted).

Regardless of the particular nature of a petitioner's claims, in order to have exhausted available

state remedies, a petitioner must have "fairly presented" his federal constitutional claims to the highest state court by apprising it of "both the factual and the legal premises of the claim he asserts in federal court." *Daye v. Attorney Gen. of State of N.Y.*, 696 F.2d 186, 191 (2d Cir. 1982) (*en banc*).

The statute prohibits the grant of a petition on a ground that has not been exhausted. *See* 28 U.S.C. § 2254(b)(1)(A). Such claims may be denied on the merits, *see* 28 U.S.C. § 2254(b)(2), or dismissed. A third option, the "stay and abeyance" procedure created by *Zarvela v. Artuz,* 254 F.3d 374, 380-82 (2d Cir. 2001), and endorsed (with some modifications) by *Rhines v. Weber,* 544 U.S. 269, 277-78 (2005), stays the federal petition to allow a petitioner to return to state court to exhaust the unexhausted claim.

B.    *The Unexhausted Claims*

After the trial court refused to accept Llewellyn's pro se motion to set aside the verdict, he never presented the claim that trial counsel failed to act on the "juror misconduct" issue to any state court for review. Llewellyn acknowledges as much in his petition. Pet. at 11. As such, this claim is entirely unexhausted and cannot now be considered in a petition for a writ of habeas corpus. Llewellyn's claim that his trial lawyer represented the victim on a prior occasion was raised for the first time on November 14, 2014. This claim is likewise unexhausted. As stated above, a defendant may seek habeas corpus relief only if he has first exhausted his state court remedies as to each claim. A petitioner exhausts his state court remedies by "giv[ing] the state courts a fair opportunity to pass upon his federal claim." *Daye v. Attorney Gen. of State of N.Y.*, 696 F.2d 186, 191 (2d Cir. 1982) (en banc); *see also Picard v. Connor*, 404 U.S. 270, 276-77 (1971).

At the oral argument, both sides agreed that Llewellyn's claims of ineffective assistance are unexhausted. In this case, the most appropriate course is to issue a stay so that Llewellyn can return to state court and exhaust the unexhausted claims. Dismissing the entire petition at this stage would put the petitioner in danger of running afoul of the one-year statute of limitations following exhaustion in the state court.[7] Accordingly, Llewellyn shall file a § 440 motion in state court by January 16, 2015.[8] He is advised that to complete the exhaustion of that claim, he must seek leave to appeal any decision denying his claim. In the meantime, this federal petition will be stayed. Within 30 days of the complete exhaustion of the claim in state court, Llewellyn shall contact this court if he wishes to lift the stay of these proceedings.[9]

## CONCLUSION

For the reasons set forth herein, Llewellyn's petition for habeas corpus pursuant to 28 U.S.C. § 2254 is stayed and will be held in abeyance pending the exhaustion of the ineffective assistance claims mentioned above.

---

[7] On March 22, 2013, the New York Court of Appeals denied leave to appeal from the Appellate Division's affirmance of Llewellyn's conviction. The conviction therefore became final 90 days later, when the period to seek certiorari review in the United States Supreme Court expired. *See Pratt v. Greiner*, 306 F.3d 1190, 1195 n.1 (2d Cir. 2002). Accordingly, the one-year period, which is not tolled by the instant petition, *see Duncan v. Walker*, 533 U.S. 167, 181 (2001), expired on June 20, 2014.

[8] This deadline is consistent with the Court's past orders in this case. In a prior letter to the Court, Llewellyn requested an extension of time to file his § 440 motion since he would be in "keeplock" until December 15, 2014. *See* Docket Entry 10. In an order dated December 12, 2014, the Court granted Llewellyn's request and directed him to file his § 440 motion by January 16, 2015.

[9] The Second Circuit has held that once a habeas petition has been stayed for further proceedings in state court, and those proceedings are finally concluded, the petitioner then has a reasonable period to return to Federal court to reopen his case. A period of 30 days has been held to be a reasonable amount of time. *Zarvela v. Artuz*, 254 F.3d at 380-81 (30 days is a reasonable period in which to reopen Federal habeas proceedings following a state court decision); *see also Rhines v. Weber*, 544 U.S. at 278 (petitioner should return to Federal court to reopen habeas case after a "brief" interval of 30 days, citing *Zarvela*); *Robinson v. Senkowski*, No. 99-2664, 100 Fed. App'x 10, *11-12 (2d Cir. 2004) (same).

So ordered.


John Gleeson, U.S.D.J.

Dated: December 22, 2014
       Brooklyn, New York